UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. _____

KEITH A. CLAYBORNE,

    Plaintiff,

vs.

GOLDEN KRUST FRANCHISING, INC.
d/b/a GOLDEN KRUST CARIBBEAN
BAKERY & GRILL,

    Defendant.
_____/

**COMPLAINT**

Plaintiff, Keith A. Clayborne ("Plaintiff" or "Mr. Clayborne"), by and through the undersigned counsel, hereby sues Defendant Golden Krust Franchising, Inc. d/b/a Golden Krust Caribbean Bakery & Grill ("Defendant" or "GK Restaurant") for damages and declaratory relief and alleges as follows:

**NATURE OF THE ACTION**

This is a case about misrepresentations and lies. The Defendant lied to Mr. Clayborne for years on end about a purportedly fair and equitable franchise system that, in actuality, was designed to benefit a few "insider" franchisees at the expense of Mr. Clayborne and others. Mr. Clayborne fell for Defendant's lies, unfortunately, and suffered significant financial loss.

GK Restaurant sells Caribbean bakery products and West Indian Cuisine. Over the span of 10 years, Plaintiff operated several GK Restaurant franchises. Plaintiff recently learned that Defendant made false statements to him solely for purposes of convincing him to join the GK

Restaurant franchise and pay substantial amounts of fees. As a result of Defendant's conduct, Plaintiff seeks recission of the franchise agreements.

## THE PARTIES

1. Keith A. Clayborne is domiciled in Florida, is a citizen of Florida, and is *sui juris*.

2. Golden Krust Franchising, Inc. is a New York corporation and currently maintains its principal business address in White Plains, New York.

3. Plaintiff has retained Lomax Legal PLLC to represent him in this action and is obligated to pay reasonable attorney's fees and costs for its services in this matter.

## JURISDICTION AND VENUE

4. This Court has diversity jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between the parties and the matter in controversy exceeds $75,000.00, exclusive of interest and cost. Plaintiff resides and is domiciled in Florida and Defendant is headquartered in New York. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 2201.

5. This Court has personal jurisdiction over Defendant because it engages in substantial business activity throughout Florida and this District.

6. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §1391(b) because all the events giving rise to this claim occurred in this District, and Plaintiff's GK Restaurant franchises were located in this District.

## GENERAL ALLEGATIONS

7. Plaintiff acquired his first GK Restaurant franchise in 2006 under the false premise that he was entering into a fair and equitable franchise.

8. Plaintiff, after relying on GK's misrepresentations, acquired six other GK

2

Restaurant franchises throughout South Florida.

9. Members of the Clayborne family, including Plaintiff's wife and sons, have also owned or managed entities that acquired various GK Restaurant franchises throughout South Florida.

10. In total, Plaintiff and his family have owned or managed entities that acquired twelve GK Restaurants in South Florida.

11. On or around February 6, 2006, Mr. Clayborne and 7 "K" Corp., a since dissolved entity, entered into their first franchise agreement with Defendant to operate a GK Restaurant at 5967 Oakland Park Blvd. Lauderhill, Florida (the "Lauderhill Franchise Agreement"). *See* Lauderhill Franchise Agreement attached as EXHIBIT A.

12. In 2007, Mr. Clayborne and 7 "K" Corp., a since dissolved entity, entered into two franchise agreements with Defendant to operate a GK Restaurant at 1354 S. SR7 North Lauderdale, Florida (the "North Lauderdale Franchise Agreement") and in Coral Springs, Florida (the "Coral Springs Franchise Agreement"). *See* Coral Springs Franchise Agreement attached as EXHIBIT B.

13. On or around April 17, 2010, Mr. Clayborne and 7 "K" Corp., a since dissolved entity, entered into a fourth franchise agreement with Defendant to operate a GK Restaurant at 178 Miramar Square Miramar, Florida (the "Miramar Franchise Agreement"). *See* Miramar Franchise Agreement attached as EXHIBIT C.

14. On or around December 28, 2015, Keith and Bernadette Clayborne and Golden Krust #6, LLC, a since dissolved entity, entered into a fifth franchise agreement with Defendant to operate a GK Restaurant at 5299 N. State Road 7 Tamarac, Florida (the "Tamarac Franchise Agreement"). *See* Tamarac Franchise Agreement attached as EXHIBIT D.

15. On or around April 11, 2016, Mr. Clayborne and Golden Krust #6, LLC, a since

dissolved entity, entered into a final franchise agreement with Defendant to operate a GK Restaurant at 801 E. Commercial Blvd. Oakland Park, Florida (the "Oakland Park Franchise Agreement"). *See* Oakland Park Franchise Agreement attached as EXHIBIT E.

16. In addition to the franchise agreements between Plaintiff and Defendant, Plaintiff was required to review and agree to the terms of Defendant's Financial Disclosure Document (the "FDD") which were incorporated in the franchise agreements by reference.

17. The franchise agreements state, in relevant part:

**You acknowledge that you have read this Agreement and our Franchise Disclosure Document** and understand and accept the terms, conditions, and covenants in this Agreement…[and that]

adherence to the terms of this Agreement, prescribed for the purpose of maintaining a **uniformly high standard of** product and **business quality**, **is of mutual importance**.

*See* Exs, A-E at §I. A. (emphasis added).

18. Further, the franchise agreements explicitly refer to the yearly FDDs and state that "[n]othing in this [a]greement or any related agreement is intended to disclaim the franchisor's representations made in the Franchise Disclosure Document." *See* Exs, A-E at §XVII. H.

19. Since 2006, when Plaintiff acquired his first GK Restaurant franchise, he has operated his franchises professionally, which earned him recognition from Defendant.

20. Plaintiff and his family were often cited in Defendant's marketing materials, which referred to the Clayborne family as having the "golden touch." *See* GK Magazine Article attached as EXHIBIT F.

21. More specifically, a magazine article quoted then President and CEO, Lowell Hawthorne, stating that the Clayborne family has "work[ed] hard to provide GK's gold standard service, food quality and ambiance to South Florida residents and have done an outstanding job

4

representing the brand." *Id*.

22. Additionally, in September 2017, Defendant wrote an email praising Plaintiff and his wife, Bernadette Clayborne, for their trust and commitment to the Golden Krust brand. The email states:

> To the prolific Clayborne family:
>
> Congratulations on another Golden Krust location. Your continued expansion is a reminder that Golden Krust is bigger than any one of us, individually. *We thank you for your continued faith in the brand and trust in us as a company.* We greatly appreciate how you have served as ambassadors of Golden Krust in the Florida market. We look forward to a fruitful relationship, and much success at this new location. Be well and take care.

*See* e-mail from Daren Hawthorne to Keith and Bernadette Clayborne, attached as EXHIBIT G.

23. Due in part to the number of GK Restaurant franchises acquired by Plaintiff and his family and their level of professionalism and service to customers, Golden Krust became a household name among members of the Caribbean community, and others, residing in South Florida.

24. Yet, even though Plaintiff and his family had contributed significantly to the Golden Krust brand, it was later revealed that Defendant had been deceiving Plaintiff and engaging in practices that significantly undercut profits for Plaintiff's franchise restaurants.

25. In or around late 2020, Plaintiff learned for the first time of Defendant's ongoing discriminatory pricing and fee schemes that favor a select number of franchises owned by "certain principals and related family members of Golden Krust" ("Family-Owned Franchises") that are separate and distinct from corporate owned stores. *See, e.g.*, 2015 Franchise Disclosure Documents ("2015 FDD") at 10 and attached as EXHIBIT H.

26. Pursuant to the franchise agreements between Plaintiff and Defendant, and the

5

FDDs provided to Plaintiff over the years, Plaintiff is required to purchase food products – the lifeline of the GK Restaurant franchise – from Defendant or a third-party entity approved by Defendant.

27. Item 8, Restriction on Sources of Products and Services, of the FDDs, state, in relevant part that:

> "In order to maintain the quality of the goods and services sold by Golden Krust restaurants and the reputation of the Golden Krust franchise network, you are obligated to purchase all Jamaican patties, jerk seasonings, jerk sauce, jerk chicken and substantially all of your breads, cakes and other baked goods from a GK affiliate, Golden Krust Bakery, Inc…[Y]ou are obligated to purchase all other food or restaurant products from sources designated by Golden Krust.

*See, e.g.*, 2011 FDD at 19 and attached as EXHIBIT I.

28. Further, Item 5, Initial Fees, of the FDD requires all newly acquired franchises to purchase "adequate opening inventory [food products]" from Defendant. *Id.* at 11.

29. Unlike franchisees such as Plaintiff, Family-Owned Franchises and other selected franchises have been allowed to purchase required food products directly from Golden Krust Caribbean Bakery, Inc., an affiliate, at a reduced cost.

30. Yet, Plaintiff had to purchase the same food products from an approved third-party vendor at a higher price.

31. Court documents, filed in *Golden Krust Franchising, Inc. v Auctus Restaurant Group, Inc. et. al* Case No. 7:20-cv-07321-KMK (November 2020) in the Southern District of New York, revealed that Defendant has acknowledged the discriminatory pricing regarding food products in e-mails and other documents.

32. In the above-referenced case, Defendant was unable to articulate any legitimate business interest to justify allowing Family-Owned Franchises to purchase food products from its affiliate while forcing other franchise owners to purchase from a third-party vendor at a higher

6

price.

33. In addition to its discriminatory pricing scheme related to food products, Defendant has also been engaged in other discriminatory pricing practices that benefit Family-Owned Franchises at the expense of other franchise owners such as Plaintiff.

34. Defendant's FDDs state that all franchise royalty and advertising fees are uniformly imposed by and payable to Golden Krust. *See, e.g.*, 2011 FDD at 12.

35. Nonetheless, for the years Plaintiff operated his GK Restaurant franchises, Defendant failed to uniformly impose these fees across the franchise system.

36. Family-Owned Franchises and other selected franchises received an unfair advantage in the form of reduced royalties and no advertising fees.

37. Court documents have revealed that Family-Owned Franchises paid $250.00 per week for royalties regardless of gross sales and Family-Owned Franchises in South Florida did not pay advertising fees.

38. However, Plaintiff had to pay 3% of gross sales in royalties and was required to pay 1% of gross sales for advertising fees for each franchise.

39. Additionally, because Family-Owned Franchises did not pay advertising fees, Plaintiff and other similarly situated franchisees bore the full cost for all advertisement activity in South Florida.

40. Despite this fact, Plaintiff received less visibility in marketing and advertisements for his franchises.

41. To move inventory, remain competitive, and stay in business within the South Florida market was nearly impossible due to Defendant's unfair pricing scheme, which purposely created a competitive advantage for Family-Owned Franchises at the expense of Plaintiff and

others similarly situated.

42. Plaintiff's profit margin was significantly reduced because of Defendant's discriminatory practices.

43. Though Plaintiff exercised reasonable care and due diligence in seeking to discover the facts that form the basis of this claim against Defendant, Defendant's deceptions and procedures used to shield its deceptions proved more successful.

44. Defendant was able to successfully conceal its discriminatory pricing and fee schemes for the years Plaintiff operated a GK Restaurant franchise through November 2020, when Plaintiff learned this information from the lawsuit filed in the Southern District of New York.

45. As such, Plaintiffs did not know, and could not have reasonably known, the facts that give rise to this claim against Defendant until November 2020.

## COUNT I
## Declaratory Judgment

46. Plaintiff adopts and realleges the allegations contained in Paragraph 1 – 45 as if fully set forth herein.

47. Plaintiff and Defendant entered into the Lauderhill Franchise Agreement, the Coral Springs Franchise Agreement, the North Lauderdale Franchise Agreement, the Miramar Franchise Agreement, the Oakland Park Franchise Agreement, and the Tamarac Franchise Agreement (collectively, the "Franchise Agreements"), all of which have an arbitration clause that includes the following language: "the arbitrator will not have the right … to award exemplary or punitive damages."

48. There is a substantial question that must be resolved with respect to whether the Franchise Agreements' arbitration clause is enforceable in light of its prohibition of an arbitrator's ability to award exemplary or punitive damages, which are available under both Florida and New

8

York law.

49. Courts have held that an arbitration agreement that contains remedial restrictions and no severability clause is unenforceable.

50. Accordingly, Plaintiff seeks a judicial determination of its powers, privileges, and rights with respect to the potentially unlawful arbitration provisions in the Franchise Agreements.

WHEREFORE, Plaintiff respectfully requests an Order declaring the arbitration clause in the Franchise Agreement invalid and unenforceable.

## COUNT II
### Fraudulent Inducement

51. Plaintiff adopts and realleges the allegations contained in Paragraph 1 – 45 as if fully set forth herein.

52. Prior to the parties executing the Franchise Agreements, Defendant falsely represented to Plaintiff through the FDDs that "[a]ll fees are uniformly imposed by and payable to Golden Krust." *See, e.g.*, 2010-2018 FDDs at § Item 6.

53. Defendant knew at the time that it represented to Plaintiff that "[a]ll fees are uniformly imposed by and payable to Golden Krust," that it did not uniformly impose such fees.

54. In November 2020, Plaintiff learned for the first time that Defendant was not imposing royalty and advertising fees in a uniform manner.

55. Court documents revealed that Family-Owned Franchises paid $250.00 per week for royalties regardless of gross sales and Family-Owned Franchises in South Florida did not pay advertising fees.

56. At the time Plaintiff entered into the Franchise Agreements, Defendant was aware of the material misrepresentation in the FDDs and intentionally provided that information to Plaintiff.

57. Defendant used this material misrepresentation to convince Plaintiff to enter each of the Franchise Agreements.

58. Plaintiff signed the Franchise Agreements in reliance upon Defendant's material misrepresentation.

59. But for Defendant's material misrepresentation, Plaintiff would not have entered the Franchise Agreements.

60. As a result of Defendant's material misrepresentation, Plaintiff suffered significant economic damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order rescinding the Franchise Agreements.

## DEMAND FOR JURY TRIAL

Plaintiff further demands a trial by jury of all issues so triable.

Dated: October 30, 2022

        Respectfully Submitted,

        /s/ *Akivia P.A. Bassaragh*
        **Akivia P.A. Bassaragh Esq.**
        Florida Bar No. 84880
        Akivia@LomaxLegal.com

        /s/ Christopher M. Lomax
        **Christopher M. Lomax Esq.**
        Florida Bar No. 56220
        Chris@LomaxLegal.com

        LOMAX LEGAL PLLC
        95 Merrick Way, 3rd Floor
        Coral Gables, FL 33134
        Telephone: 305.582.6506
        Facsimile: 305.503.6897
        *Counsel for Plaintiff*